IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION

UNITED STATES OF AMERICA         *
                                 *
                                 *
VS.                              * CRIMINAL ACTION NO. W-18-CR-144
                                 *
DREW AVERY LUNA                  *     January 8, 2019

BEFORE THE HONORABLE ALAN D ALBRIGHT, JUDGE PRESIDING
                SENTENCING PROCEEDINGS

APPEARANCES:

For the Government:          Stephanie Smith-Burris, Esq.
                             Assistant United States Attorney
                             PO Box 828
                             Waco, Texas 76701

For the Defendant:           Gregory K. Simmons, Esq.
                             100 E. Avenue C, Suite C
                             Killeen, Texas 76541

Court Reporter:              Kristie M. Davis
                             United States District Court
                             800 Franklin Ave, Ste 316
                             Waco, Texas 76701


    Proceedings recorded by mechanical stenography, transcript

produced by computer-aided transcription.

(January 8, 2019, 10:23 a.m.)

DEPUTY CLERK:  Sentencing proceeding in Criminal Action W-18-CR-144, Defendant No. 1, styled United States of America vs. Drew Avery Luna.

MS. SMITH-BURRIS:  Stephanie Smith-Burris for the Government, Your Honor.

MR. SIMMONS:  Good morning, Your Honor.  Greg Simmons for Mr. Drew Avery Luna.

THE COURT:  Good morning, Mr. Simmons.  Thank you for being here.

(Defendant was sworn.)

THE COURT:  Mr. Luna, you've appeared before this Court before.

THE DEFENDANT:  Yes, sir.

THE COURT:  And I gave this break, again, as with the gentleman before you, to determine whether or not to go above the sentencing guidelines or the range of the sentencing guidelines.  I am happy to go back through and -- and, Mr. Simmons, I'll look to your counsel as well.  I'm happy to go back through everything we did in the first sentencing if you think it's necessary to help Mr. Luna understand why we're here, or we can proceed without doing that.  It's entirely up to you.

MR. SIMMONS:  Thank you, Your Honor.  Your Honor, it's not necessary to go back over what we did in December.  And we're

prepared to go forward --

THE COURT:  Okay.

MR. SIMMONS:  -- at this time.

THE COURT:  Mr. Luna, do you agree with that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  Mr. Luna, I've given you all this opportunity.  Is there anything in addition you'd like to say to the Court before -- and let me add that I have received and considered -- it's undated -- but a letter from Domingo Luna. And that is your grandfather?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  I wanted you to know that I looked at that.

Mr. Luna, you -- actually I'm going to reverse this just for a second.

Mr. Simmons, perhaps I'll let you start, and if Mr. Luna wants to add to it, I -- in this case I think you might be able to articulate better for him, but I'll certainly give Mr. Luna any opportunity he wants.

MR. SIMMONS:  Very well.  Thank you, Your Honor.

THE COURT:  I'm giving you credit.  You appear to be exceptionally articulate and I want to give him the best shot.

MR. SIMMONS:  Very well.  Thank you, Your Honor.

Your Honor, before we go forward, I just wanted to acknowledge that Mr. Luna does have a grandmother and an aunt

out here.  Also he has friends.  The friends were here last time when we were here in December and I just wanted to point that out to the Court.

THE COURT:  And I appreciate you doing that.  It means a lot to the Court when family members take the time to attend.  It has a great -- it has a great impact.  It may or may not show it -- I may or may not show it, but it means a lot to me that they would take the time to be here.

MR. SIMMONS:  Very well.  Thank you, Your Honor.

And, Your Honor, just as it relates from when we left off that you were considering going either through a departure or a variance, we would just respectfully request that you not consider going outside the recommended time of 30 to 37 months.

From the moment you said that you were considering it and that you needed time to -- and you gave us time to go over this, I can just tell you that it's weighed on my client's mind.  Those words that you were going to consider going outside on a higher level on the recommended guidelines was something that forced him to go back, reflect and relook at his life and the things that he's done for the last three years.  And if you look at the criminal aspect of what he's charged with in his history, it's from 20, and he's just now 23.  He's a young man.  And he's got involved with drugs and drugs has led to some of this.  Some of this is his own action, but again, some of it drug induced.  But the fact that when he

heard those words and my discussions with him, that's weighed heavily on his mind.  That, in and of itself, is a form of punishment and I would like the Court to understand that's what he's been living with and dreaded this particular day.

However, I do want to point out to the Court that the reflection and the relooking of his life at his past transgressions has led to the fact that if he -- normally when I ask and when a client says that they're remorseful and they're sorry for what they've done, remorse does show with my client in that he's actually scared because he doesn't know what's going to happen.

I would ask that the Court, when you look at the PSI, Part E, the Paragraphs 82 and 83 where it says that the probation officer had not found any factors that would warrant a departure from the applicable guidelines and also 83 where they say that they don't -- that they find no factors for a variance or imposition of the -- of a nonguideline sentence.  Your Honor, those are the experts.  They're the ones that put together this report, it's what we rely on and we'd ask that the Court consider that the work that they do and take that into consideration and that we ask that you not go outside the 30 to 37 month range of punishment.

THE COURT:  Well, let me comment on the last thing you said, and I'm not scolding you when I say this.  I try and be sensitive to the fact that I wear this black robe and I sit up

here, and so I'm not -- you know, the probation office is -- I have great respect for them.  I've worked with them when I was a magistrate for a number of years.  Them and the presentence group and now.  But with all due respect to what they do, they don't have to sit up here.  And I'm not complaining about sitting up here.  I worked really hard to get this position.  But -- you know, and so when I go -- I take what they recommend.  It's always a very valuable starting point, an invaluable starting point.  But, you know, then I've got to go through my own -- you know, my own analysis, you know, based on everything.

And I'll tell you what hasn't changed is your client.  While he may -- he is young.  He's very young.  And were -- the issues that he were -- the only issues he'd had in his life, for example, in 2017, just two years ago, a year ago, were it to be the possession of a controlled substance of one or more but less than four grams, you know, possession of a dangerous drug.  All these -- all those things I tend to -- theft of property.  I don't like it, but it -- you know, but that's not his record.  I mean, his record isn't just possession.  And I'm -- I'm not -- again, I'm not scolding you, but I have to protect the record here.  What I have with your client is not just -- for example, in 2016, possession of marijuana under two ounces.  Okay.  You can be in Colorado now and buy two ounces.  But starting in 2016, it appears to me, at age 20, he is, you

know -- you know, assault causing bodily injury to a family member.  You know, he had -- you know, been struck in the -- you know, he struck Shelby Jackson, who's a woman, in the face several times with a closed fist because they'd been arguing via text and Facebook.  That -- that isn't good.

On June 27th of 2016 police officers were dispatched.  Their victim -- and this is, you know, a month later.  The victim reported that her boyfriend struck her in the face with a closed fist and used a taser on her.  Then he violated the protective order in July.

Five months later, six months later, attempted assault again.  According to the officer's report, the victim reported her son became angry with her and told her he hated her and wished she was dead.  He then pulled her hair and spit in her face.  In other words, he assaulted her.

Then a month later, we don't just have possession of a controlled substance but he also has a deadly weapon.

During the search of the vehicle, the officers recovered a 22-caliber pistol, 2.4 grams of methamphetamine, not a small amount, and several pills identified as Promethazine and Tylenol with codeine.  This is while he was on probation.  In other words, he had second chance, second chance, second chance and he gets caught with drugs and a firearm.

Then we move forward to January this year.  And the problem again with this theft of property is -- you know, the

victim Michelle Weinstein reported the defendant came to her home and stole jewelry, electronics, firearms and U.S. currency.  You know, that's again putting someone at risk by going to their house.

On January 16th he also got caught with four grams or more of another controlled substance of methamphetamine.

So basically all the way through his very short life starting back in 2010 at age 14 when he evaded arrest, your client has been unable to control himself.  So that's how we get to a criminal history at his age of six which is the highest it can be.

And so, you know, I'm faced with what to do in terms of the amount of punishment, and I don't think that 30 to 37 months is a light sentence.  I think that's a long time to be in -- I think one month is a long time to be in prison, but the problem I have is that at 23 Mr. Luna has established that -- that nothing that's -- no punishment that's taken place for a substantial criminal activity has prevented him from going on and committing more criminal activity, and each time it's more serious.  Involving guns.

So you look at, you know, what he's dealing with right now.  He was stopped by police officers.  He had marijuana, a glass pipe, methamphetamine residue and digital scale.  He had a second backpack that contained a blowtorch, marijuana residue, sandwich bags, methamphetamine residue, digital

scales, four plastic bags containing marijuana, 18.2 grams of methamphetamine, 15.6 grams of THC wax, and the most important thing to me, a loaded 40-caliber Smith & Wesson.

When someone with his history not only has that kind of drug paraphernalia but has a loaded firearm, I have to assume that he intended to use it.  I've had -- I've had people come in front of me who said, look, I'm sorry.  I know I was a felon.  I know I had a firearm, but if you saw where I lived or the community I'm in or the people I have to be with, you'd carry a gun too because I need that for self-defense, but I haven't heard that argument here, and I don't think that is the reason he had a gun.  I think it had to do with his conduct in terms of the drug activities.  And that, to me, is the most dangerous person that we have in our community is someone who not only is engaged in the sale, manufacture -- I don't know if he was -- but the sale of methamphetamine which I think is the worst possible drug that anyone can be selling and has a loaded firearm at the time he's arrested.

So those are all the things I've taken into consideration here.  Again, I'm happy to hear you say anything you'd like in addition on Mr. Luna's behalf.  And I'm happy to hear from Mr. Luna, but that is a -- is as bad a history of anyone I've had in front of me.  Certainly I've had men in here that were 60 years old that didn't have this criminal history.  So I say that all not to beat up on Mr. Luna because I'm sitting up here

but to explain to you and to his family and for the record why it is that I'm considering doing a variance.

MR. SIMMONS:  I understand, Your Honor.  And, Your Honor, we didn't feel that you were beating us or scolding us. It's -- those are the facts and those are things that this Court will take into consideration.  However, Your Honor, if you considered giving him on the higher end on the sentencing guideline, there's also a provision that he will have to do at least three years of a supervised release which is not easy. I've sat on a lot of these and represented individuals.  It's not an easy walk that they're going to have to do certain things, and that ensures that Mr. Luna will continue to walk the straight and narrow.

So now we're not dealing with a 23-year-old that had some issues.  Now you're looking at someone that the Court could have an eye on up until the time that he's 30.  Again, hoping that age brings on maturity, but the three years of supervised release as far as getting counseling, getting employment and things along those lines.  And if he does not do these things, he's subject to come back especially with what we're asking for you to consider, that he can get another three years on top of what he's capable of and what this Court can give him at this time.  That ensures safety and welfare of the community and we would ask that you consider that also.  And at this time I have nothing else to add.

And I believe, Mr. Luna, you don't want to say anything?

It's difficult.  And so at this time Mr. Luna's not going to say anything, Your Honor, and we'd ask that that not be held against him.  It's -- he's -- like I said, he's had a lot of time to reflect on what was said last time we were here.

THE COURT:  Well, Mr. Luna, I want you to know I think Mr. Simmons has done an outstanding job for you.  He has articulated every -- every reason he could give me for not imposing a variance and going up.  And I agree that -- and I often invoke the power of the supervised release.  I know you've been over here a couple of times, Mr. Simmons, and maybe it was even one of your other clients who I've gone down and given less time on the basis that the supervised -- I thought the supervised release would help ensure the safety.  But I doubt that in any case I've had the person also had a loaded firearm at the time they were -- they committed the crime.  And to me that's something that again I think the factors in 18 United States Code Section 3553 compel the Court to consider here.

Therefore, pursuant to the Sentencing Reform Act of 1984, it is ordered, adjudged and decreed that the following sentence is imposed:  You are hereby placed in the custody of the United States Bureau of Prisons to serve a term of imprisonment of 60 months.

The basis for the variance in this case is I find that the

nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence for the criminal conduct and to provide and protect the public from further crimes of the defendant.

I don't remember you telling me that this gentleman had issues with drug dependance.  Maybe -- maybe he does.  If -- I hope that while he's in there he participates in the program.  There's a 500-hour program I would certainly recommend.  I can't order it but I would recommend that he take.  I think that also benefits him with respect to his placement in prisons.  In other words, it helps him move from one prison to a better prison along the way.  I don't know that that's right, but I believe that that helps and certainly would help him.

I'm going to impose a term of supervised release of three years.  You have articulated to Mr. Luna the fact that if he commits another offense while on supervised release we'll be visiting here again.  There is no probation.

I'm going to impose a fine of $500.  And let me explain why I'm doing that.  It's not punitive.  It is my belief that one of the best things that could happen to Mr. Luna is that he work -- there are work programs.  I've gone to prisons now, toured them, met people and had prisoners say that one of the

things that was the best for them while they're in prison was they have the ability to work while they're in prison, to make some money.  And it's not a lot of money, but they can use that to pay the fine off.  And I think that would benefit Mr. Luna to work while he is in custody if he chooses to.

There's no restitution.  And there is a special assessment of $100.

And I believe that's all we have.

Thank you, sir.

MR. SIMMONS:  Judge, at this time I'd like to make an oral motion to withdraw as counsel.  Reason being is that there's a possibility that -- Mr. Luna has indicated that he'll file an appeal, and I don't do appeals.  And I would ask that you grant my motion to withdraw on that matter, but as far as the notice of appeal, I'll make sure I get that to the Court immediately.

THE COURT:  If you'll do that.  With the Court's great appreciation for your service in this case and the hard work that you've done and the great job that you've done, if you'll just make sure that notice of appeal.  If his rights to file the notice are -- are protected, I'll grant your motion to withdraw.

MR. SIMMONS:  Very well.  Thank you, Your Honor.

THE COURT:  Thank you.

(Hearing adjourned at 10:46 a.m.)

UNITED STATES DISTRICT COURT )

WESTERN DISTRICT OF TEXAS      )


     I, Kristie M. Davis, Official Court Reporter for the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

     I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

     Certified to by me this 18th day of February 2019.


                         */s/ Kristie M. Davis*
                         KRISTIE M. DAVIS
                         Official Court Reporter
                         800 Franklin Avenue, Suite 316
                         Waco, Texas 76701
                         (254) 340-6114
                         kmdaviscsr@yahoo.com